IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DEBORAH A. GERVASE PLAINTIFF

v. NO. 4:25-cv-00987-PSH

SOCIAL SECURITY ADMINISTRATION DEFENDANT

# MEMORANDUM OPINION AND ORDER

In this case, filed pursuant to 42 U.S.C. 405(g), plaintiff Deborah A. Gervase ("Gervase") challenges the denial of her application for disability insurance benefits. Gervase does so on the following four grounds: (1) the Administrative Law Judge ("ALJ") committed error at step two of the sequential evaluation process by failing to find that Gervase's mental impairments and "inflammatory arthritis condition," see Docket Entry 6 at CM/ECF 13, are severe impairments; (2) Gervase's residual functional capacity was erroneously assessed because her standing or walking limitations and use of a cane were not adequately considered, (3) the ALJ committed error at step five when she relied upon the mistaken and/or

confusing testimony of a vocational expert, and (4) the ALJ failed to fully develop the record. Because substantial evidence on the record as a whole supports the ALJ's decision, and the decision is not based on any legal error, this case will be dismissed.[1]

The record reflects that Gervase was born on March 28, 1974. She alleged in her application that she became disabled and unable to work on October 31, 2020, as a result of impairments that include hip replacements, ulnar nerve damage, low strength/grip in her right hand, pain and numbness in her legs, lumbar spine degenerative disc disease, depression, and anxiety. She was fifty years old on June 30, 2024, the date she was last insured. Thus, the relevant period is from October 31, 2020, through June 30, 2024. The question for the ALJ was whether Gervase was disabled for purposes of the Social Security Act during that period.[2]

---

[1] The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id. "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." See Collins v. Saul, 648 F.3d 869, 871 (8th Cir. 2011).

[2] The Court agrees with the Commissioner of the Social Security Administration that for purposes of Gervase's entitlement to disability benefits, the relevant period begins on the alleged onset date, and "the relevant analysis is whether [she] was actually disabled prior to the expiration of her insured status." See Docket Entry 13 at CM/ECF 1, n.1 (citing Mueller v. Astrue, 561 F.3d 837 (8th Cir. 2009); Hinchey v. Shalala, 29 F.3d 428 (8th Cir. 1994).

In the ALJ's decision denying Gervase's application, the ALJ extensively summarized the evidence. There is no dispute about the evidence nor the adequacy of the ALJ's summary of the evidence. The Court will not repeat the summary in any detail, although some of it will be recounted in order to place Gervase's assertions of error in an historical context.

Gervase first maintains that the ALJ committed error at step two. It is Gervase's contention that the ALJ failed to find that Gervase's mental impairments—impairments in the form of depression and anxiety—and her "inflammatory arthritis condition" are severe impairments. Gervase maintains that the ALJ's error "compromised the rest of the analysis about [Gervase's] ability to function in a workplace, including the pivotal [residual functional capacity] determination." See Docket Entry 6 at CM/ECF 13.

At step two, the ALJ is required to identified the claimant's impairments and determine if they are severe. An impairment is severe if it has "more than a minimal effect on the claimant's ability to work." See Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1992) (internal quotations omitted). The determination is strictly a medical determination. See Bowen v. Yuckert, 482 U.S. 137 (1987).

At step two, the ALJ found that Gervase has severe impairments in the form of "obesity, osteoarthritis of the knee, residual effects of bilateral hip arthroplasty with right hip revision, cervical spondylosis with radiculopathy, psoriasis, and pelvic enthesopathy." See Transcript at 23. The ALJ recognized that Gervase occasionally complained of depression, anxiety, and sleep problems and sought medical attention for her complaints. The ALJ found, though, that Gervase had no more than mild limitations in the four broad areas of mental functioning used to evaluate how mental impairments limit a person's ability to work.[3] Having so found, the ALJ then found that Gervase's mental impairments would not cause significant limitations in her ability to perform work activities and were therefore not "severe." The ALJ does not appear to have considered Gervase's "inflammatory arthritis condition" at step two.

Substantial evidence on the record as a whole supports the ALJ's findings at step two. The Court so finds for two reasons: first, the medical evidence relevant to Gervase's mental impairments is minimal and otherwise unremarkable, and second, she offered no medical evidence to substantiate her "inflammatory arthritis condition."

---

[3] The four broad areas of mental functioning are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.

With respect to the medical evidence relevant to Gervase's depression and anxiety, she reported that her symptoms manifest themselves in decreased concentration, a depressed mood, excessive worry, irritability, and nervous/anxious behavior. See Transcript at 342. She reported that many of her symptoms are associated with her poor physical health. See Transcript at 547.

Gervase has taken, or is taking, prescription medication for her symptoms. Her medications have included Zoloft for depression, see Transcript at 343, which she stopped taking after only a month because she did not like the way it made her feel, and hydroxyzine for anxiety, see Transcript at 546-547, which she only takes as needed. She reported having never been "psychiatrically hospitalized or [having] participated in intensive outpatient, partial hospitalization, or residential treatment programs." See Transcript at 547.

Gervase's mental status examinations at her presentations, or during her telehealth visits, for her various impairments, though, were largely unremarkable. Although she typically had an anxious mood, she otherwise was routinely alert and had, inter alia, good eye contact, appropriate behavior, organized speech, a logical thought process, appropriate thought content, full orientation, normal attention and concentration, no paranoia

or delusions, good insight, and intact judgment and memory. See, e.g., Transcript at 324-325 (10/20/2022); 348 (11/04/2022); 330-331 (11/22/2022); 342 (11/29/2022); 344-345, 351 (12/02/2022); 412 (12/13/2022); 354 (12/30/2022); 358 (02/03/2023); 408 (02/14/2023); 392 (06/26/2023); 496 (08/04/2023); 469 (08/15/2023); 579 (09/26/2023); 667 (12/05/2023); 662 (12/07/2023).

On August 10, 2023, Gervase completed a function report in connection with her application. See Transcript at 248-255. In the report, she represented that she does not go out much, as she isolates herself. She has difficulty with, inter alia, memory, completing tasks, concentrating, understanding, and getting along with others.

On August 29, 2023, Dr. Jeremiah D. Isbell, Psy.D., (“Isbell”) performed a psychological evaluation of Gervase. See Transcript at 546-553. Isbell noted that although Gervase “endorsed long-standing anxiety and more-recent depression,” her complaints appear to revolve largely around her poor health, ongoing pain, and “related limitations and psychosocial stresses” such as housing instability and finances. See Transcript at 550. Isbell additionally noted that Gervase’s complaints of being unable to be around people were belied by her activities which include shopping in stores and volunteering at the “Moose Lodge.”

In short, the ALJ could find as he did because there is little medical evidence that Gervase's depression and anxiety had more than a minimal effect on her ability to work through the date last insured. The ALJ did not err at step two when he found that the impairments were not "severe."

With respect to Gervase's "inflammatory arthritis condition," she offers no medical evidence to substantiate her condition. In fact, her brief is devoid of any mention of such evidence and offers no explanation of what the condition is. See Docket Entry 6 at CM/ECF 13. It is not impossible that the condition she identifies as an "inflammatory arthritis condition" is actually osteoarthritis of the knee. If so, the ALJ accepted the impairment as a severe impairment at step two and considered it in assessing Gervase's residual functional capacity.

Notwithstanding the foregoing, the ALJ's failure to identify Gervase's mental impairments and "inflammatory arthritis condition" as severe impairments is ultimately of no legal significance. Once the ALJ proceeds past step two, the labeling of an impairment as "severe" or "non-severe" has no legal significance because she must consider all impairments in assessing a claimant's residual functional capacity. The ALJ represented, and the Court accepts, that she considered all of Gervase's impairments in assessing her residual functional capacity. See Transcript at 22-23.

Gervase offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Gervase maintains that her residual functional capacity was erroneously assessed because her standing or walking limitations and use of a cane were not adequately considered. It is Gervase's contention that her abilities to stand or walk are far more restricted than that found by the ALJ. Gervase supports her contention, in part, by citing the assessment of her physical limitations made by Dr. Benjamin Stronach, M.D., ("Stronach"), who opined that Gervase cannot sit/stand/walk in combination for eight hours in an eight hour workday.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most a person can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, and the assessment must be supported by some medical evidence. See Jones v. Astrue, 619 F.3d 963 (8th Cir. 2010).

Here, the ALJ assessed Gervase's residual functional capacity and found that through June 30, 2024, Gervase had the residual functional capacity to perform light work with additional limitations. The additional limitations relevant to Gervase's ability to stand or walk were as follows:

> ... With normal breaks, ... [Gervase can] stand/walk for a total of six hours in an eight-hour workday. In terms of postural limitations, [she] can never climb ladders, ropes or scaffolds; never crawl; but can occasionally climb ramps and stairs, balance, kneel, stoop, and crouch. ... She uses a cane in the non-dominant left upper extremity for prolonged ambulation and on uneven terrain. [She] must avoid more than occasional exposure to wetness, hazards such as machinery with open moving mechanical parts, and unprotected heights.

<u>See</u> Transcript at 26.

Light work requires a good deal of standing or walking. See 20 C.F.R. 416.967(b). In <u>Frankl v. Shalala</u>, 47 F.3d 935 (8th Cir. 1995), the Court of Appeals observed that light work requires a claimant to be capable of standing or walking for a total of six hours in an eight-hour workday.

Gervase clearly suffers from impairments that impact her ability to stand or walk, and she uses a cane for ambulation. The evidence relevant to the assessment of her ability to stand or walk for a total of six hours in an eight-hour workday is capable of more than one characterization, and substantial evidence on the record as a whole supports the characterization the ALJ made. The Court so finds because the ALJ adequately considered the medical evidence and Gervase’s statements to her medical providers, the medical opinions and prior administrative medical findings, and her function report and testimony during the administrative hearing.

With respect to the medical evidence and Gervase's statements to her medical providers, the record reflects that she had bilateral total hip replacement surgery in 2015 for osteoarthritis in her hips. See Transcript at 27, 324, 380-386. She also experienced neck, back, and knee pain prior to, and after, the alleged onset of disability date. The ALJ exhaustively summarized the medical evidence and Gervase's statements to her medical providers for the period from the alleged onset of disability date through the date last insured, even considering medical evidence after the date she was last insured. See Transcript at 27-34, 35. It is not necessary to repeat that summary. It is enough to instead repeat the ALJ's analysis of the medical evidence and Gervase's statements, which was as follows:

> [Gervase] has a history of reported back and neck pain (with cervical spine degenerative changes/spondylosis per imaging), radiation symptoms into her extremities, past history of hip replacement surgeries, and psoriasis with possible or suspected joint involvement. She also reported right knee pain, and imaging showed mild osteoarthritis. She was prescribed medications to address pain, neuropathic symptoms, and psoriasis. As of late July 2023, [Gervase] was found to have femoral loosening of her components that was causing daily pain, and she underwent surgery at the end of July. Although she experienced increased pain, functional limitations, and mobility limitations associated with initial recovery, she progressed to weight-bearing as expected. By late September, two months after surgery, she reported no significant limitations in performing her activities of daily living (except for expected exertional fatigue and weakness associated with

> her recovery). She progressed from use of a walker to a cane, which she used at times, and she also reported decreased pain. Physical exams at times showed tenderness in her back, neck, and other joints, but she also was observed to be healthy appearing, in no acute distress, comfortable, and with normal gait, no cervical spine tenderness, and normal range of motion. She did not pursue some offered treatments, including injections for her hand/finger in 2024 and biologics for her psoriasis in 2023. However, she did begin pain management in 2024, and medications were characterized as helpful to address her hip and joint pain. However, [Gervase] testified at the hearing that she continues to struggle to walk prolonged periods or on uneven ground without a cane.

See Transcript at 34.

With respect to medical opinions and prior administrative medical findings, the ALJ noted the findings of Douglas Denney, PA-C, ("Denny"), who performed a physical consultative examination of Gervase on September 8, 2023. See Transcript at 31, 36, 555-559. Denny observed, inter alia, that Gervase used a walker for ambulation; had full strength and intact sensation in her lower extremities; had a normal range of motion in her cervical spine and examined joints, with the exception of her right hip which was not examined because of her "recent hip revision." See Transcript at 558. Denny noted, though, that he was unable to "ascertain whether [Gervase] will have any physical limitations secondary to her chronic hip pain for the next [twelve] months." See Transcript at 559.

Gervase challenges the ALJ's reliance on Denney's findings, noting that Denny made his findings without "significant portions of the medical treatment records" and without "guidance on how to answer the [ALJ's consultative examination] questions." See Docket Entry 6 at CM/ECF 14. The Court is not convinced that the ALJ erred in the manner in which she handled Denny's findings. The Court so finds for two reasons. First, the ALJ could and did find that Denny's findings were only useful as "objective medical evidence but not persuasive as opinion evidence." See Transcript at 36. Denny made his findings within two months of Gervase's hip revision surgery, and Denny could properly decline to assess Gervase for long-term limitations. Second, the Social Security regulations do not require a consultative examiner to include a medical opinion in his report. See 20 C.F.R. 404.1519n(c)(6).

The ALJ also noted the findings of state agency medical examiners Drs. Michael Keer, Joshua Rubin, Marta Madera-Ruiz, and David Strand. See Transcript at 35-36, 75-84, 87-96. At the initial level, the examiners lacked sufficient evidence to rate Gervase's claim. At the reconsideration level, the examiners found that Gervase was capable of performing a reduced range of light work. The ALJ could and did properly find the opinions "generally persuasive." See Transcript at 36.

The ALJ additionally considered Gervase's function report and testimony during the administrative hearing, see Transcript at 34-35, 248-255, having also previously done so in connection with the step two analysis, see Transcript at 24-25. The ALJ could and did note, for instance, that Gervase was able to attend to her personal care; perform light housework, except when she was recovering from surgery; prepare simple meals; volunteer; shop in stores; and drive an automobile, except when she was recovering from hip surgery.

Gervase maintains that the record in this case is not complete because consideration was not given to Stronach's March 6, 2025, assessment of Gervase's physical limitations. In the assessment, Stronach opined, in part, that Gervase cannot sit/stand/walk in combination for eight hours in an eight hour workday. See Transcript at 45-46.

The ALJ issued her decision on September 27, 2024, see Transcript at 38, or approximately five months before Stronach's assessment. Gervase offered the assessment in appealing to the Appeal Council. The assessment was not considered by the Appeals Council because the assessment did not relate to "the period at issue." See Transcript at 2. The Court is not convinced that the failure to consider Stronach's assessment warrants a remand for at least three reasons.

First, the ALJ asked Gervase's attorney at the beginning of the September 18, 2024, administrative hearing if the record were complete. See Transcript at 50. Counsel answered that the record was indeed complete, and Gervase cannot now complain that the record is not complete.

Second, Stronach's assessment is a simple check-list form. For instance, in opining that Gervase could perform only part-time or no substantial work and cannot sit/stand/walk in combination for eight hours in an eight hour workday, Stronach merely checked two boxes. He offered no objective medical evidence to support his opinions.

Third, the Court assumes that Stronach's March 6, 2025, assessment can be tied to his August 8, 2024, examination of Gervase, an examination after the date she was last insured. See Transcript at 859-860. Although the assessment is likely new and material, the Appeals Council could and did find that the assessment did not relate to the period at issue. Moreover, the Court is not persuaded that the assessment "presents a reasonable probability that the outcome of the decision would change." See Christopher S. v. Bisignano, No. 25-cv-1377-JRT-JFD), 2026 WL 2352882, 3 (D.Minn. July 22, 2026), report and recommendation adopted, No. 25-cv-1377-JRT, 2026 WL 2351539 (D.Minn. Aug. 13, 2026).

It is not the role of the Court to re-weigh the evidence and, even if the Court would decide the case differently, it cannot reverse the ALJ's decision if that decision is supported by good reason and is based on substantial evidence. See Dillon v. Colvin, 210 F.Supp.3d 1198 (D.S.D. 2016). In fact, the Court may not reverse the ALJ's decision merely because substantial evidence would have supported an opposite decision. See Id. Here, the evidence is capable of more than one acceptable characterization, and the ALJ could properly find as she did.

Gervase offers a third reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Gervase maintains that the ALJ committed error at step five when she failed to clarify how much the hypothetical individual's need for a cane on uneven terrain, and for prolonged ambulation, eroded the number of available jobs. Additionally, Gervase maintains that one of the jobs identified by the vocational expert exceeded Gervase's sitting limitation.

At step five, the ALJ must show that the claimant could have performed other jobs. See Crawford v. Colvin, 809 F.3d 404 (8th Cir. 2015). In making the showing, the ALJ may rely upon a vocational expert's testimony in response to "a properly formulated hypothetical question." See Gann v. Berryhill, 864 F.3d 947, 952 (8th Cir. 2017).

As a part of the step five determination, the ALJ must show that the claimant can perform, or could have performed, jobs existing in significant numbers in the national economy. See Hall v. Chater, 109 F.3d 1255 (8th Cir. 1997). “Work exists in significant numbers in the national economy when it ‘exists in significant numbers either in the region where [the claimant] lives or in several regions of the country.’” See Karen E. v. Kijakazi, No. 21-cv-3015-CJW-MAR, 2022 WL 17548642, 5 (N.D. Iowa Sept. 15, 2022) (quoting 42 U.S.C. 423(d)(2)(A)). The Court of Appeals has not identified a “definitive number of jobs in the national economy that constitutes the lower threshold for a significant number of jobs in the national economy.” See Id.

Here, a vocational expert testified during the administrative hearing. See Transcript at 66-72. She was asked if there were jobs available in the national economy for a hypothetical individual with Gervase’s residual functional capacity for a reduced range of light work, three limitations being that the individual can “sit for four hours in an eight-hour workday,” “stand or walk for six hours in an eight-hour workday,” and “uses a cane in the non-dominate left upper extremity for prolonged ambulation and uneven terrain.” See Transcript at 67. The vocational expert testified that jobs were available for that individual, the jobs being as follows:

> (1) Furniture Rental Clerk, Dictionary of Occupational Titles ("DOT") 295.357-018, of which there are approximately 56,000 jobs in the national economy;
>
> (2) School Bus Monitor, DOT 372.667-042, of which there are approximately 27,000 jobs in the national economy; and
>
> (3) Public Area Attendant, DOT 344.677-014, of which there are approximately 5,000 in the national economy.

See Transcript at 68. The ALJ and vocational expert then had the following exchange in follow-up:

> ALJ: All right. And just to help me understand. So how does the use of the cane impact the jobs at the light exertional level?
>
> Vocational Expert: The jobs at the light exertional level when using a cane for prolonged ambulation, the job numbers are definitely – the jobs are definitely decreased but there are still –there is still an availability of jobs at the light exertional level with the use of the cane for prolonged ambulation.
>
> ALJ: All right. Thank you for that. ...

See Transcript at 68-69. The ALJ embraced the vocational expert's response to the hypothetical question and found at step five that there was work Gervase could have performed.

The ALJ did not err in relying upon the vocational expert's answer for two reasons. First, with respect to the number of available jobs, the Court adopts the reason advanced by the Commissioner of the Social Security Administration ("Commissioner"), which is as follows:

> The hypothetical to the [vocational expert] very plainly included a need for a cane for uneven terrain and prolonged ambulation (Tr. 67). There was no implied ambiguity in the question; [she] testified to the number of representative jobs existing for a person with those exact limitations, e.g., the numbers she gave reflected the reduced number of jobs available to a person with the restrictions in the hypothetical (Tr. 68). The ALJ's follow up question and the [vocational expert's] response merely clarified the obvious: fewer jobs would be available for a person who required an assistive device for ambulation (Tr. 68-69).

See Docket Entry 13 at 10. Second, the Court accepts for purposes of this Memorandum and Order that the job of School Bus Monitor exceeded her sitting limitation. The remaining jobs—Funiture Retail Clerk and Public Area Attendant—have an aggregate number of more than 60,000 jobs and are a sufficient number to constitute a significant number of jobs in the national economy. See Weiler v. Apfel, 179 F.3d 1107 (8th Cir. 1999) (32,000 surveillance monitor jobs nationally constitutes a significant number of jobs in the economy the claimant can perform.)

Gervase offers a fourth and final reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Gervase maintains that the ALJ failed to fully develop the record.

The ALJ has an obligation to fully develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining if the ALJ fully developed the record; the determination is made on a case by case basis. See Id. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. See Pratt v. Asture, 372 Fed.Appx. 681 (8th Cir. 2010).

The Court is satisfied that the record contains sufficient information for the ALJ to have made an informed decision. She had the benefit of, and adequately considered, the medical evidence and Gervase's statements to her medical providers, the medical opinions and prior administrative medical findings, and her function report and testimony during the administrative hearing.

Gervase appears to fault the ALJ for failing to base her residual functional capacity assessment on an opinion from a treating or examining medical provider. There is no requirement, though, that the assessment be supported by a specific medical opinion. See Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016). The assessment need only to be supported by

"some medical evidence of the claimant's ability to function in the workplace." See Id. at 932 (citing Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). Here, the record contains medical evidence of Gervase's ability to function in the workplace, and the ALJ did not err when he relied upon the evidence in assessing Gervase's residual functional capacity.

Gervase also faults the ALJ for failing to obtain missing medical records and for relying upon the prior administrative findings of state agency medical consultants when their findings were not based on a review of the complete record. Gervase also faults the ALJ for relying on medical opinions that predated an EMG "which reportedly showed neurological deficits with cervical etiology," and an MRI "which this time showed cord involvement by flattening." See Docket Entry 6 at CM/ECF 11.

The ALJ did not err in the respects alleged above for the following reasons. First, Gervase's attorney represented at the beginning of the administrative hearing that the record was complete and made no mention of missing evidence. Second, the fact that additional medical evidence may have become available after the state agency consultants evaluated Gervase's treatment records does not render their opinions unreliable. Third, the Court is not convinced that the new evidence created a reasonable probability that the outcome of the decision would change.

The Court finds, in conclusion, that there is substantial evidence on the record as a whole to support the ALJ's findings, and she did not commit legal error. Gervase's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 5th day of November, 2026.

UNITED STATES MAGISTRATE JUDGE